```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
                                           ECF CASE
SAEEDA A. MAHMUD, M.D.,              :
                                           05 Civ. 8090 (WCC)
              Plaintiff,             :

      - against -                    :      OPINION
                                            AND ORDER
WALTER KAUFMANN, M.D., JEFF AUERBACH, :
M.D., JANE BROOKS, M.D., GOPAL SHAH,
M.D. and DAVID BRODY, M.D.,           :
Individually, Jointly and Severally,
                                      :
              Defendants.
                                      :
- - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

COTZ & COTZ
**Attorneys for Plaintiff**
180 Franklin Turnpike
Mahwah, New Jersey 07430

LYDIA B. COTZ, ESQ.

    Of Counsel

ADELMAN, SHEFF & SMITH, LLC
180 Admiral Cochrane Drive
Annapolis, Maryland  21401

S. ALLAN ADELMAN, ESQ.
MICHAEL I. JOSEPH, ESQ.

    Of Counsel

       - and -

JEFFERS & IRELAND, P.C.
55 Walls Drive
Fairfield, Connecticut 06824

STEPHEN M. COWHERD, ESQ.

    Of Counsel      **Attorneys for Defendants**

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff Saeeda A. Mahmud, M.D., brings this action against defendants Walter Kaufmann, M.D., Jeff Auerbach, M.D., Jane Brooks, M.D., Gopal Shah, M.D., and David Brody, M.D., (collectively "defendants") arising from the denial of her medical staff privileges at Bon Secours Community Hospital (the "Hospital"). Plaintiff alleges that defendants failed to renew her contract of affiliation with the Hospital and thwarted her efforts to contract with Orange Regional Medical Center ("ORMC") in violation of 42 U.S.C. § 1981 and the New York Human Rights Law ("NYHRL"), New York Executive Law § 290, *et seq.* Plaintiff also asserts an antitrust claim under the Sherman Act, 15 U.S.C. § 1, *et seq.*, and New York General Business Law § 340. In addition, plaintiff raises common law claims for interference with prospective economic advantage and prima facie tort. Presently before the Court are defendants' motion to dismiss plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and plaintiff's motion to amend her Complaint. For the reasons stated herein, plaintiff's motion to amend is granted and her Amended Complaint is considered subject to defendants' motion to dismiss, which is granted in part and denied in part. It is granted with respect to the third cause of action under NYHRL and the claims for prima facie tort, but denied with respect the § 1981 claims, the fourth cause of action under NYHRL, the antitrust claims under the Sherman Act and the New York General Business Law and the claim for tortious interference with prospective economic advantage.

## BACKGROUND

The following facts are what could best be gleaned from plaintiff's Amended Complaint, which conveys less than a clear understanding of the facts in the case. We note that the Amended

Complaint in this action bears a striking similarity to the Complaint filed in a previous action involving this plaintiff and some of these defendants, which was dismissed by this Court without prejudice and with leave to amend.  *See Mahmud v. Bon Secours Charity Health Sys.*, 289 F. Supp. 2d 466, 468-69 (S.D.N.Y. 2003) (Conner, J.)

Plaintiff, a native of Pakistan with an Islamic religious background, is board certified in internal medicine.  (Am. Complt. ¶¶ 6,  8.)  In or about 1996, plaintiff relocated from New York, New York to Port Jervis, New York to take over the practice of Dr. Kruluwitz[1], a retiring pulmonologist (the "practice").  (*Id.* ¶ 9.)  Dr. Kruluwitz sold his practice to the Hospital, who resold it to plaintiff.  (*Id.*)

In contemplating the move, plaintiff met with Dr. Bluett, the then Medical Director of Mercy Hospital.[2]  (*Id.* ¶ 9.)  Plaintiff perceived Dr. Bluett to be a representative of the Hospital, who was speaking on its behalf.  (*Id.*)  Plaintiff questioned Dr. Bluett on the Hospital's need for cardiologists[3] and received assurances that, although Kaufmann was the only cardiologist in the Port Jervis area, there was a need for an additional cardiologist and her move would be beneficial to all concerned. (*Id.* ¶¶ 10, 11.)  According to plaintiff, Bluett warned her that Kaufmann had a "monopoly" on all

---

[1] The Amended Complaint does not state the full name of Dr. Kruluwitz or Dr. Bluett.  Nor does the Amended Complaint indicate the title of "M.D." after their names, although it appears from the Amended Complaint that they are both medical doctors.

[2] Mercy Hospital was later renamed Bon Secours Community Hospital.  (*Id.* ¶ 9.)

[3] A pulmonologist  is a physician who specializes in the treatment of the lungs; pulmonology is an internal medicine subspeciality.  Cardiology, on the other hand, addresses disorders of the heart, another speciality of internal medicine.  Other than asserting that plaintiff is board certified in internal medicine, the Amended Complaint does not indicate plaintiff's specialty.  It is unclear whether she is a cardiologist or a pulmonologist.  Nor is it clear why she purchased a pulmonology practice, but was concerned about the need for a cardiologist in the area.

cardiac tests administered at the Hospital, but, in an attempt to induce her to take over Kruluwitz's practice, Bluett assured her that he would change this arrangement. (*Id.* ¶¶ 11, 12.) Kaufmann also, apparently, promised plaintiff that he would allow her to read her own patient's cardiac tests administered at the Hospital;[4] however, once she began working, he sought to review all of her work. (*Id.* ¶ 13.) In addition, Bluett, "[a]s an inducement to buy the practice," allegedly promised plaintiff office space directly across from the Hospital. (*Id.* ¶ 14.) Plaintiff claims that she relied on these promises and representations in deciding to pass up other opportunities for cardiology practices and purchased the practice from the Hospital for $40,000. (*Id.* ¶¶ 14, 15.)

Defendants, all doctors affiliated with the Hospital, have, according to plaintiff, "*de facto* control" of the Hospital through a mutually agreed upon rotation of influential positions, which include: Chief of Staff, Medical Director and Chief of Medicine, in addition to chairing the Credentials, Medical Examinations and Quality Assurance Committees. (*Id.* ¶¶ 16, 17.) Plaintiff further asserts that defendants, by controlling admitting privileges, consulting privileges and referrals, influence other physicians who vote on these matters. (*Id.* ¶ 17.)

Prior to June 2001, plaintiff often criticized the Hospital's management and the level and quality of care provided by the Hospital and the various doctors on staff. (*Id.* ¶ 18.) Plaintiff frequently wrote the Hospital expressing her concerns without result. (*Id.* ¶ 19.) She began charting her comments about inadequate care and was apparently criticized by the Hospital administration and her peers for so doing. (*Id.*)

In spring 2001, the Joint Accreditation Hospital Commission ("JAHC") evaluated the

---

[4] It is unclear why Kaufmann would have anything to do with plaintiff's patients when they each had their own practice.

Hospital's Medicare supervision and care.  (*Id.* ¶ 20.)  Plaintiff made an appointment with JAHC to express her concerns regarding the level and quality of care provided at the Hospital.  (*Id.*)  Plaintiff was allegedly approached by certain employees and administrators of the Hospital[5] prior to her appointment and warned not express her criticisms.  (*Id.* ¶ 21.)  Specifically, she was told "we can do a lot to you [if you complain]" and "it will not be good for you [if you complain]."  (*Id.* (alterations in original).)  Plaintiff, frightened by these remarks, cancelled her meeting with JAHC. (*Id.*)  Plaintiff allegedly had a "contract of affiliation" with the Hospital that was due for renewal in July 2001.  (*Id.* ¶ 31.)  Plaintiff, however, failed to file a renewal application in a timely manner.[6] (*Id.*)  According to plaintiff, it "is usual and customary to accept such renewals out of time, as they generally are *pro forma*."[7]  (*Id.*)

On September 1, 2001, plaintiff received a letter, on Hospital letterhead, from an entity identified as the "Ad Hoc Committee"[8] (the "Committee").  (*Id.* ¶ 23.)  In the letter, the Committee claimed that plaintiff's conduct was "erratic and suspect," and therefore "demanded that plaintiff submit to physical and mental examinations."  (*Id.*)  In addition, particularly after September 2001,

---

[5] The Amended Complaint identifies these individuals as "Messers[.] Kenwood, Stanzoine, and Brunelle."  (Am. Complt. ¶ 21.)  However, with the exception of Brunelle who is later identified, the first names and/or positions of the other individuals are not provided.

[6] Plaintiff claims that she overlooked the renewal application because of "the building antagonism arising from her criticism of the Hospital."  (*Id.* ¶ 31.)

[7] Plaintiff maintains that the Hospital failed and refused to make a new contract with her after her position expired in July 2001, due to "an illegal mixture of racial and religious bias, coupled with a plan to limit competition." (*Id.* ¶ 34.)

[8] The Committee consisted of defendants in addition to several other doctors allegedly under their control.  (*Id.* ¶ 24.)  Plaintiff alleges that the Committee was the "alter ego" of defendants.  (*Id.* ¶ 25.)

plaintiff was frequently targeted by the Hospital's employees and medical staff with racist remarks, including epithets such as "foreigner," "dirty foreigner" and "bomber." (*Id.* ¶ 22.) Plaintiff complained to Thomas Brunelle, then the Executive Vice President and Chief Operating Officer of the Hospital; no steps were taken to halt this alleged abuse. (*Id.*) Plaintiff also alleges that since the summer of 2001 some or all of defendants, either personally or through others, informed plaintiff's patients that she was "crazy," "insane" and "has serious mental problems" for the apparent purpose of disrupting her relationship with her patients.[9] (*Id.* ¶¶ 45, 46.)

At some point, the Committee advised plaintiff that the Hospital, through the Committee, had initiated a review of the charts of plaintiff's patients. (*Id.*) Plaintiff was later advised that her care was found to be substandard. (*Id.* ¶ 26.) Plaintiff secured her own peer review of the same charts, which determined her care to have been appropriate. (*Id.* ¶ 27.) In addition, defendants, through the Committee, allegedly forced plaintiff to submit to a psychiatric evaluation that determined that she did not suffer from any condition precluding her from practicing medicine. (*Id.* ¶ 28.) Defendants also allegedly forced plaintiff to take medical leave by threatening to initiate charges that would lead to revocation of her medical license. (*Id.*) Plaintiff acceded and "asked for leave as demanded."

---

[9] In addition to these comments, plaintiff alleges that:

Defendants have said or caused to be said to Plaintiff's patients:
- a) That Plaintiff has lost her privileges at the Hospital.
- b) That because Plaintiff had no privileges at the Hospital, the patient had to either switch his care to a different doctor or forego admission to the Hospital.
- c) [T]hat Plaintiff's care of said patient had been impaired or deficient.
- d) That Plaintiff's competency or ability were questionable.
- e) That Plaintiff was the subject of professional disciplinary proceedings.

(*Id.* ¶ 46.)

(*Id.* ¶ 29.)

The Committee on Physicians' Health of the New York Medical Society ("CPH"), as a result of defendants' complaints, scrutinized plaintiff's conduct. (*Id.* ¶ 30.) The CPH did not find any basis for taking action against plaintiff. (*Id.*) The CPH works closely with the licensing authority, the Office of Professional Medical Conduct ("OPMC"), which deals with doctors who suffer from psychiatric problems and drug addictions. (*Id.*) Defendants repeatedly reminded plaintiff of N.Y. PUB. HEALTH L. § 2803, which requires a hospital that declines to renew a physician's privileges because of health or competency issues to report that physician to the OPMC.[10] (*Id.* ¶ 32.) During summer 2003, one or more of defendants advised the OPMC that plaintiff was resigning from the Hospital "to avoid disciplinary proceedings." (*Id.*) The OPMC investigated plaintiff's conduct at the Hospital from October 2003 to April 2004 and closed the case "without further action anticipated." (*Id.* ¶ 33.)

Based on these events, as well as other facts irrelevant to the present action, plaintiff filed suit on February 14, 2003 against the Hospital, Kaufmann, Auerbach, Brooks and Brody for substantially the same claims she raises here. *See Mahmud*, 289 F. Supp. 2d at 468-69. The defendants in that case moved to dismiss the Complaint, which motion was granted without prejudice by this Court by Opinion and Order dated October 31, 2003 and with leave to amend the Complaint to supply the missing allegations in plaintiff's slander claim or reassert her other claims after exhausting her remedies with the Public Health Council ("PHC") as required under N.Y. PUB. HEALTH L. § 2801-b. *See id.* at 469.

_____

[10] The Amended Complaint refers to "OPD" which this Court can only assume is the result of a typographical error.

In the interim, plaintiff applied for a contract of affiliation with ORMC in May 2003, which would grant plaintiff privileges at that facility. (*See id.* ¶¶ 38, 40, 42.) Plaintiff alleges that little or no action was taken on the application until October 2003, when she was contacted by Dr. Mark Tuckfelt, the Vice President of Medical Affairs and Medical Director for ORMC, who informed her that, based on information he learned from plaintiff's colleagues, "he questioned her character and ability to work with others." (*Id.* ¶¶ 39, 43 (internal quotation omitted).) Allegedly, Tuckfelt went on to suggest "that a withdrawal 'prior to review by the Credentials Committee would not be reportable to the National Practioner Data Bank.'" (*Id.* ¶ 39.) Plaintiff continued with her application, to which ORMC responded with "foot-dragging, obstructionism and impossible demands, such as demanding that she produce non-existent minutes from [Hospital] meetings, and patient records to which [p]laintiff had no access." (*Id.* ¶¶ 40, 41.) On June 28, 2004, ORMC's Medical Executive Committee denied plaintiff's application. (*Id.* ¶ 42.)

Plaintiff petitioned the PHC in January 2004 for a review of the Hospital's decision. (*Id.* ¶ 35.) The PHC, by decision dated July 26, 2004, determined that the Hospital's decision was "consistent with [NY]PHL § 2801-b."[11] (*Id.* ¶ 36.) According to plaintiff, the PHC did not perform an independent investigation, nor did it hold any hearings before accepting the Hospital's findings

---

[11] N.Y. PUB. HEALTH L. § 2801-b, in pertinent part, states:

It shall be an improper practice for the governing body of a hospital to refuse to act upon an application for staff membership or professional privileges or to deny or withhold from a physician, . . . privileges in a hospital, or to exclude or expel a physician, . . . from staff membership in a hospital or curtail, terminate or diminish in any way a physician's, . . . professional privileges in a hospital, without stating the reasons therefor, or if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant.

of fact "at face value."  (*Id.* ¶ 37.)  The instant action was commenced on September 19, 2005.


## DISCUSSION

### I.    Motion to Amend

Rule 15(a) of the Federal Rules of Civil Procedure allows a plaintiff the right to file an Amended Complaint "as a matter of course" when no responsive pleading has been filed.  "It is settled law that a motion to dismiss for failure to state a claim is not a responsive pleading within the meaning of Rule 15(a)."  *Harrison v. Fed. Pac. Credit Co., LLC*, No. 05 CV 727S, 2006 WL 276605, at *2 (W.D.N.Y. Feb. 3, 2006).  Although plaintiff did not file her Amended Complaint until after the defendants served and filed their motion to dismiss, Rule 15(a) permits plaintiff to amend her Complaint.  Therefore, plaintiff's Amended Complaint will be considered subject to defendants' pending motion to dismiss.


### II.    Motion to Dismiss

#### A.    Standard of Review

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the issue is "whether the claimant is entitled to offer evidence to support the claims."  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984).  A court's task in determining the sufficiency of a complaint is "necessarily a limited one."  *Id.*  A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Padavan v. United States*, 82 F.3d 23, 26 (2d Cir. 1996) (quoting *Hughes v. Rowe*, 449 U.S. 5, 10 (1980)).  Generally,

"conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed. 1997); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir. 1995).  On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff.  *See Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993); *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 583 (S.D.N.Y. 1993) (Conner, J.).

### B.      Section 1981 and NYHRL Claims

#### 1.      Statute of Limitations

As an initial matter, defendants assert that plaintiff's first and third causes of action raising claims under § 1981 and NYHRL based on defendants' alleged interference with plaintiff's efforts to contract with the Hospital are barred by the statute of limitations.  Section 1981, amongst other things, protects the rights of individuals to "to make and enforce contracts."  42 U.S.C. § 1981. Claims raised under this section before November 21, 1991, the date the amendments to the Civil Rights Acts were enacted, were subjected to strict interpretation.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 176 (1989) ("Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts.").  The phrase "to make and enforce contracts" was expanded by the 1991 amendments to the Civil Rights Act to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

Section 1981 does not contain its own statute of limitations for personal injury actions and, therefore, federal courts have traditionally adopted the statute of limitations of the forum state for personal injury claims.  *See Sleigh v. Charlex, Inc.*, No. 03 Civ. 1369, 2004 WL 2126742, at *3 (S.D.N.Y. Sept. 14, 2004).  As the statute of limitations for personal injury actions brought in New York State is three years, defendants urge the Court to apply this limitations period to plaintiff's § 1981 claim.  N.Y. CIV. PRAC. L. & R. 214(2); *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996).  However, the Supreme Court, in *Jones v. R.R. Donnelly & Sons Company*, concluded that § 1981 claims based on the amendments to the Civil Rights Act of 1991 were subject to the federal four-year "catch-all" statute of limitations created by 28 U.S.C. § 1658(a).  541 U.S. 369, 382 (2004) (stating "[w]e conclude that a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990—and therefore is governed by § 1658's 4-year statute of limitations—if the plaintiff's claim against the defendant was made possible by a post-1990 enactment"); *see Sundaram v. Brookhaven Nat. Labs.*, 424 F. Supp. 2d 545, 564-65 (E.D.N.Y. 2006); *Sleigh*, 2004 WL 2126742, at *3.

Plaintiff's first claim under § 1981, asserting that defendants were racially motivated in thwarting plaintiff's efforts to contract with the Hospital, arises from incidents which occurred from approximately 1996 through May 2002.  Therefore, plaintiff had until May 2006 to commence an action with respect to these claims; this action was filed on September 19, 2005.  Therefore, plaintiff timely filed this action within the four-year period of limitations provided under the statute.

Defendants also seek dismissal of plaintiff's third cause of action raised under NYHRL § 290

10

based on statute of limitations.[12]   These claims are governed by a three-year statute of limitations. N.Y. C.P.L.R. § 214(2).  The claims under the New York Human Rights Law are substantially the same as the claims under § 1981 and arise from the same incidents which ended around May 2002. Plaintiff had until May 2005 to file her complaint alleging violations of the NYHRL.  As stated, plaintiff did not file her Complaint until September 15, 2005.  Therefore, plaintiff's third cause of action under NYHRL is untimely and is therefore dismissed.

## 2.    <u>Failure to State a Claim</u>

As the standards for claims under § 1981 and NYHRL are identical, our decision with respect to the § 1981 claim will apply with equal force to the NYHRL claim.  *See Perez Rivera v. Hertz Corp.*, 990 F. Supp. 234, 236 (S.D.N.Y. 1997); *see also Ayton v. Lenox Hill Hosp.*, No. 93 Civ. 6601, 1997 WL 10000, at *1-2 n.1 (S.D.N.Y. Jan. 10, 1997) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995)).

Section 1981 "prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race, [and it] covers . . . efforts to impede access to the courts or obstruct nonjudicial methods of adjudicating disputes about the force of binding obligations." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  A § 1981 claim requires a plaintiff to allege: (1) that he is a member of a racial minority; (2)

---

[12] Plaintiff has raised two claims under NYHRL.  One claim alleges that defendants thwarted plaintiff's efforts to establish a relationship with the Hospital.  The other alleges that the defendants thwarted plaintiff's relationship with ORMC.  We note that defendants are only alleging that the claim related to the Hospital is beyond the statute of limitations.  Therefore, regardless of our decision with respect to this issue, plaintiff's NYHRL claim regarding ORMC remains and will be analyzed on substantive grounds.

that defendants had an intent to discriminate against him on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute, namely make and enforce contracts, sue and be sued, give evidence, etc. *See id.* To survive a motion to dismiss, "the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994); *see Albert v. Carovano*, 851 F.2d 561, 571-72 (2d Cir. 1988). "It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court would find a violations of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6)." *Martin v. N.Y. State Dep't of Mental Hygiene*, 588 F.2d, 371, 372 (2d Cir. 1978).

Plaintiff has satisfied the first element of a § 1981 claim by asserting that she is a native of Pakistan and is of Islamic background. (Am. Complt. ¶ 6.) As for the second and third elements, plaintiff has alleged that defendants were racially motivated in "twarting her effort to contract" with both the Hospital and with ORMC. (*Id.* ¶¶ 47, 48.) This is sufficient to plead a claim under § 1981. However, defendants claim that plaintiff has failed to allege a contractual relationship with the Hospital.

Indeed, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 126 S. Ct. 1246, 1249 (2006). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Id.* at 1250. As can best be gleaned from the Amended

Complaint, plaintiff is asserting that she was prevented from renewing her privileges, which she identifies as "a contract of affiliation," at the Hospital and from seeking privileges at ORMC in violation of § 1981.  (Am. Complt. ¶¶ 31, 38, 42 , 47, 47A.)  At this stage, alleging the denial of hospital privileges is a sufficient contractual relationship to maintain a § 1981 claim.  *See Hamad v. Nassau County Med. Ctr.*, 191 F. Supp. 2d 286, 300 (E.D.N.Y. 2000) (finding that plaintiff doctor "adequately plead the essential elements of a § 1981 cause of action" by alleging that "his termination and denial of privileges were predicated upon a racially discriminatory animus").  Plaintiff has alleged the necessary elements of these claims and therefore defendants' motion to dismiss the Amended Complaint with respect to these claims must be denied.

### C.     The Antitrust Claims

Plaintiff raises claims for violations of 15 U.S.C. § 1, *et seq.*, and N.Y. GEN. BUS. L. § 340 in that defendants conspired to create a monopoly over specialized medical services in the Port Jervis area.  In furtherance of these claims, plaintiff seeks an injunction restraining defendants from interfering with plaintiff's applications to various hospitals in addition to treble damages, attorney's fees and litigation costs.[13]  Defendants assert that plaintiff's antitrust claim under the Sherman Act must fail because plaintiff has failed to allege an antitrust injury or a legally recognized conspiracy

---

[13] Although plaintiff does not specifically allege a claim under the Clayton Act, sections 4 and 16 of that Act, 15 U.S.C. §§ 15, 26, permit a private party to recover damages and seek injunctive relief for any violation of the Sherman Act. *See Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 397-98 (2d Cir. 2002), *overruled on other grounds*, *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 160-61 (2004) ("The substantive provisions of the Sherman Act determine what conduct by the defendant is actionable.  The Clayton Act determines what injury a plaintiff must suffer in order to bring suit.").  As plaintiff is seeking damages and injunctive relief, we therefore treat plaintiff's suit as seeking recovery under the Sherman Act through the private right of action provided for in the Clayton Act.

by defendants.  (Defs. Mem. Supp. Mot. Dismiss at 19.)

Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.  However, only unreasonable restraints are actionable under the antitrust laws.  *See New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 411 (S.D.N.Y. 2000) (Conner, J.) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing, Co.*, 472 U.S. 284, 289 (1985)).  "The Donnelly Act, N.Y. GEN. BUS. LAW § 340, was 'modelled on the Federal Sherman Act of 1890,' and therefore 'should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result.'" *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 192 (S.D.N.Y. 2006) (citing *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y. 2d 513, 518, 634 N.E.2d 158, 611 N.Y.S.2d 786 (1994) (internal quotation marks omitted)).  "Under New York law, the state and federal antitrust statutes 'require identical basic elements of proof.'" *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 332-33 (S.D.N.Y. 2003) (quoting *Altman v. Bayer Corp.*, 125 F. Supp. 2d 666, 672 (S.D.N.Y. 2000)).  Therefore, our analysis with respect to the claims under 15 U.S.C. § 1 will apply with equal force to the claims under N.Y. GEN. BUS. L. § 340.

"To withstand a motion to dismiss, the plaintiff in a Sherman Antitrust Conspiracy claim must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce." *In re Nasdaq Mkt.-Makers Antitrust Litig.*, 894 F. Supp. 703, 710 (S.D.N.Y. 1995).  We are reminded that "[w]hile dismissals under this standard should be granted sparingly, 'conclusory allegations which merely recite the litany of antitrust . . . will [not]

14

suffice." *Yoonessi v. N.Y.S. Bd. for Prof'l Med. Conduct*, No. 03 CV 871S, 2005 WL 645223, at *25 (W.D.N.Y. Mar. 21, 2005), *aff'd*, 162 F. App'x 63, 66 (2d Cir. 2006) (citations omitted, alterations in original).  "As the Supreme Court has stated, '[i]t is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.'" *Elec. Commc'n Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir. 1997) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983)) (alterations in original).

"[A]n antitrust complaint must adequately define the relevant product market, and allege antitrust injury and conduct in violation of the antitrust laws."  *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 417 (S.D.N.Y. 2003) (citing *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 185 (S.D.N.Y. 2000)); *see Rock TV Entm't, Inc. v. Time Warner, Inc.*, No. 97 Civ. 0161, 1998 WL 37498, at *2 (S.D.N.Y. Jan. 30, 1998).  "An antitrust injury is an 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Piccone v. Bd. of Dirs. of Doctors Hosp. of Staten Island, Inc.*, No. 97 Civ. 8182, 2000 WL 1219391, at *3 (S.D.N.Y. Aug. 28, 2000) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (citing *Associated Gen. Contractors of Cal.*, 459 U.S. at 535 n.31).  It should "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be the type of loss that the claimed violations . . . would be likely to cause." *Piccone*, 2000 WL 1219391, at *3.  "This requirement, which applies to actions seeking injunctive relief as well as damages, stems from the fundamental principle that '[t]he antitrust laws . . . were enacted for "*the protection of competition, not competitors*.""" *Sage Realty Corp. v. ISS*

15

*Cleaning Servs. Group, Inc.*, 936 F. Supp. 130, 135 (S.D.N.Y. 1996) (quoting *Brunswick*, 429 U.S. at 488 (in turn quoting *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962))) (internal citations omitted, emphasis in original); *see Rock TV Entm't*, 1998 WL 37498, at *2. Therefore, to allege an antitrust injury, "a plaintiff must show more than that she was injured by certain defendants' conduct." *Salomon v. Our Lady of Victory Hosp.*, No. 99 CV 0048E, 1999 WL 955513, at *2 (W.D.N.Y. Oct. 5, 1999).

In support of these claims, plaintiff alleges that defendants conspired "for the purpose of injuring [p]laintiff's business and practice, and that of other physicians, by driving away their patients and by making it impossible for them to admit patients from the Port Jervis area into the Hospital." (Am. Complt. ¶ 56.) Plaintiff alleges that this was done by defendants to maintain a monopoly over cardiology, oncology and gastroenterology in the Port Jervis area, which reduced competition and was detrimental to consumers of medical services by severely limiting their choice of competing providers. (*Id.* ¶¶ 56-58.) The Amended Complaint identifies the relevant product market as "the tri state area, centered in Port Jervis, New York and extending north to Monticello, New York west to Mildford, Pennsylvania; South to Newtown, New Jersey and east to Middletown and Warwick, New York." (*Id.* ¶ 55.)

This Court is aware of the difficulty plaintiff will have in proving these claims. For example, if defendants' purpose was to prevent competition, why would they have sold to plaintiff the practice acquired from Dr. Kruluwitz? And why would Dr. Bluett have attempted to persuade plaintiff to buy it by telling her that there was a need in the area for another cardiologist? Moreover, insofar as plaintiff's claim is based on the fact that her contract of affiliation with the Hospital was not renewed, that claim is considerably weakened by her failure to file a timely renewal application.

16

However, on a motion to dismiss for failure to state a claim, the Court should not be influenced by the possibility, or even the likelihood, that the plaintiff will be unable to prove the allegations of the complaint.  The critical determination is whether the complaint makes all the necessary allegations. The Amended Complaint here satisfies that standard, however marginally.  Defendants' motion to dismiss the antitrust claims is, therefore, denied.

### D.      Common Law Claims

Plaintiff also alleges common law claims for interfering with prospective economic advantage, Am. Complt. ¶¶ 51, 52; "malicious and retaliatory reporting" by defendants to CPH and OPMC, *id.* ¶¶ 60, 61; misrepresenting plaintiff's "situation" to her patients with the intent to "disrupt [p]laintiff's relationship with these patients," *id.* ¶¶ 62, 63; and for "caus[ing] reports against [p]laintiff to be made to OPMC and CPH causing her to be investigated by these bodies, her professional status threatened, questioned and slandered," *id.* ¶¶ 64-66.

### 1.      Interference With a Prospective Economic Advantage

Plaintiff's fifth cause of action asserts that defendants maliciously and intentionally interfered with the business relationships plaintiff had with her patients.  With respect to this claim, the Amended Complaint states:

> The actions of the [d]efendants towards [p]laintiff were malicious and were solely intended to harm her by interfering with her prospective economic advantage and business relationships, by driving away patients, or forcing patients to consult other doctors with Hospital privileges, through unlawful and/or improper means.  Among others, these patients included but were not limited to Milton Curtis, Marion DeGroat, Alice Hicks, Donald Mohan, Frances Shields, Marjorie Howe and Daniel Morris.

17

(*Id.* ¶ 51.)  Plaintiff's tenth cause of action raises claims that defendants made misrepresentations to plaintiff's patients.   Specifically, plaintiff alleges:

> 62.   Defendants knew of [p]laintiff's business relationship with various patients when they misrepresented her situation to them.  Among others, these patients included but were not limited to Milton Curtis, Marion DeGroat, Alice Hicks, Donald Mohan, Frances Shields, Majorie Howe and Daniel Morris.
>
> 63.   Defendants intended to disrupt Plaintiff's relationship with these patients, and knew that their comments were likely to have that effect.

(*Id.* ¶¶ 62, 63.)  We note at the outset that plaintiff has failed to raise any objections to the dismissal of the tenth cause of action.  It is unclear what cause of action plaintiff is attempting to allege. However, as can best be determined, plaintiff appears to have alleged some of the elements of a tortious interference claim as a separate cause of action.[14]  Therefore, we shall treat her fifth and tenth causes of action as one claim for tortious interference with a prospective business relationship.

To maintain an action for tortious interference with a plaintiff's business relations under New York law a plaintiff must demonstrate that: "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship in injured." *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997); *see Scutti Enters., LLC v. Park Place Entm't Corp.*,

---

[14] Defendants read this cause of action to be a claim for slander.  As we have stated in our previous opinion, should plaintiff wish to raise a claim for slander, she must identify adequately who actually made the allegedly slanderous statements, when they were made and to whom they were communicated. *Mahmud*, 289 F. Supp. 2d at 476.  Plaintiff's failure to provide this information in the previous action was precisely the reason we granted defendants' motion to dismiss plaintiff's prior action and with leave to amend her Complaint to allege these elements.  However, as can best be discerned, plaintiff has alleged some of the elements of a tortious interference claim as a separate cause of action.

322 F.3d 211, 215 (2d Cir. 2003).

"To claim tortuous interference with a prospective business relationship . . . a plaintiff 'must specify some particular, existing relationship through which plaintiff would have done business but for the allegedly tortuous behavior.'" *Id.* (citing *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995)). "[I]t is well-settled that a plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir. 1998) (citing Restatement (Second) of Torts § 766B cmt. c (1979)). With respect to the elements of this claim:

> To satisfy the second requirement, the defendants must interfere with the business relationship directly; that is, the defendant must direct some activities toward the party and convince the third party not to enter into the business relationship with plaintiff. To meet the third requirement, a plaintiff must demonstrate that the action complained of was motivated solely by malice or to inflict injury by unlawful means rather than by self-interest or other economic considerations.

*Allcar Motor Parts Corp. v. Fed.-Mogul Corp.*, No. 96 Civ. 4419, 1998 WL 671448, at *5 (S.D.N.Y. Sept. 29, 1998) (citations omitted).

Plaintiff alleges that defendants spoke with or directed others under their influence to speak with plaintiff's patients about: plaintiff's loss of privileges at the Hospital; the need for patients to seek another physician if they wish to be treated at the Hospital; the asserted deficiency of plaintiff's care and competency; and the professional disciplinary proceedings involving plaintiff. (Am. Complt. ¶ 46.) Plaintiff alleges that defendants spoke to these individuals "in a manner calculated to disrupt and/or breach her business relationships with said patients." (*Id.* ¶ 46.) Plaintiff also alleges that defendants knew of plaintiff's business relationship with these patients and intended to

19

disrupt it.  (*Id.* ¶¶ 62, 63.)   These actions allegedly resulted in harming plaintiff's business relationships with her patients.  (*Id.* ¶ 52.)  It appears that plaintiff has pled sufficiently a claim for tortious interference with a business relationship.

Defendants assert that plaintiff's claim for intentional interference with prospective economic advantage is subject to a one-year statute of limitations because it alleges damage to plaintiff's reputation.  (Defs. Mem. Supp. Mot. Dismiss at 18 (citing *Pedraglio Loli v. Citibank, Inc.*, No. 97 Civ. 2179, 1997 WL 778750, at *4 (S.D.N.Y. Dec. 18, 1997) ("The New York Courts have consistently ruled that a claim which is ostensibly based upon the intentional torts of interference with advantageous or contractual relations, but which alleges injury to reputation, is a disguised defamation claim and subject to a one-year limitations period under CPLR 215(3).")).)  However, the one-year period is applied where the damages claimed are defined in terms of an injury to reputation.  *Id.*  Plaintiff defines her damages as injuries to her "business relationships."  (Am. Complt. ¶¶ 52, 63.)   In addition, the Amended Complaint states that defendants have made comments from 2001 to present.  (*Id.* ¶¶ 45, 46.)  Defendants argue that this time period "is too vague to withstand a motion to dismiss on statute of limitations grounds."  (Defs. Reply Mem. at 6-7.)  However, "[d]ismissal for failure to state a claim based on statute of limitations is appropriate only if a complaint shows clearly that a claim is not timely."  *Hughes v. LaSalle Bank, N.A.*, 419 F. Supp. 2d 605, 611 (S.D.N.Y. 2006) (citing *Harris v. City of New York*, 186 F.3d 243, 251 (2d Cir. 1999).  The Amended Complaint does not clearly show that these claims are untimely as the comments have been made from 2001 to present.  Therefore, plaintiff's allegations are sufficient to survive dismissal based on the statute of limitations and defendants' motion to dismiss this claim is denied.

20

### 2. __Prima Facie Tort__

Plaintiff's eighth cause of action asserts that defendants maliciously and for retaliatory purposes, "caused [p]laintiff to be reported to CPH and OPMC on grounds that were unfounded, and solely for retaliatory purpose." (Am. Complt. ¶¶ 60, 61.)  In her tenth cause of action plaintiff asserts that defendants, in bad faith and for punitive and retaliatory purposes, "caused reports against [p]laintiff to be made to OPMC and CPH, causing her to be investigated by these bodies, her professional status threatened, questioned and slandered." (Am. Complt. ¶¶ 64, 65.)  Defendants assert that these two causes of action are essentially the same and that both are claims for prima facie tort.  Indeed, with respect to the eighth cause of action, plaintiff contends that this cause of action sounds in prima facie tort.  (Am. Complt. ¶¶ 60, 61; Pl. Mem. Opp. Mot. Dismiss at 5.)  As these claims are indistinguishable, we will treat them as one claim for prima facie tort.

Defendants seek to dismiss these claims on the basis of statute of limitations.  An action for prima facie tort is governed by the one-year statute of limitations for intentional torts under New York law.  N.Y. C.P.L.R. 215(3); *see Ding v. Bendo*, No. 03 CV 1237, 2006 WL 752824, at *7 (E.D.N.Y. Mar. 23, 2006).  This year "commenc[es], at the latest, when the acts in question were completed and plaintiffs were damaged thereby." *Della Villa v. Constantino*, 246 A.D.2d 867, 868, 668 N.Y.S. 2d 724 (3d Dep't 1998) (citing *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980)).

In her Amended Complaint, plaintiff asserts that her conduct was reviewed by CPH based on defendants' complaints about her behavior and that CPH works closely with OPMC.  (Am. Complt. ¶ 30.)  Plaintiff does not indicate when defendants reported this behavior to CPH or when CPH made a final decision; the Amended Complaint merely states that CPH found no basis to take

21

action against plaintiff.  (*Id.*)  Defendants also made reports to OPMC, which plaintiff acknowledges were made pursuant to compulsory reporting requirements under the Public Health Law.  (*Id.* ¶ 32.)  OPMC thereafter conducted an investigation that was concluded in April 2004 and the case was "closed without further action anticipated."  (*Id.* ¶ 33.)  We find it difficult to believe that plaintiff was damaged by the reports made to CPH and OPMC when no action was taken on either application and, with respect to the report to OPMC, defendants were obligated by law to make such reports.  In any event, both investigations were completed in April 2004, requiring plaintiff to file her claim for prima facie tort by April 2005.  The instant action was not filed until September 19, 2005—well beyond the one-year period of limitations.  Plaintiff acknowledges that prima facie tort is subject to a one-year statute of limitations but states that "[l]ike malicious prosecution, the statute begins to run when the criminal prosecution ends."  (Pl. Mem. Opp. Mot. Dismiss at 5.)  Plaintiff offers no support for this statement, nor could we find any.[15]  However, even if we were to follow plaintiff's logic, her claim still would fail.  Assuming that plaintiff meant that the prima facie tort would run from when the "criminal prosecution" ended (we can only assume she meant it would run from when the investigation ended) as indicated above, her action was filed untimely and must therefore be dismissed.

Were the action timely filed, plaintiff still cannot make out a prima facie case.  Prima facie

---

[15] Plaintiff cites to *Mejia v. City of New York*, 228 F. Supp. 2d 234 (E.D.N.Y. 2002), for support.  Indeed, that case dealt with a claim for malicious prosecution and noted that "[a] cause of action for malicious prosecution accrues on the date that the proceeding is terminated in favor of the plaintiff."  *Id.* at 254.  However, this case does not even address prima facie tort or, under any reading, even remotely imply that prima facie tort claims are similar to malicious prosecution claims with respect to when the claim accrues.  Other then the fact that both a claim for prima facie tort and malicious prosecution have a one-year statute of limitations, we are unable to discern how that case is even remotely related to the case before this Court and plaintiff has failed to provide us with any comprehensible reasoning as to how these two cases are comparable.

tort consists of "four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 469 N.E.2d 1324, 480 N.Y.S.2d 466 (1984). The allegation of special damages is a "critical element" for a prima facie tort cause of action and plaintiff must demonstrate that they "suffered specific and measurable loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985). Plaintiff's Amended Complaint is completely devoid of such allegations. Plaintiff, in her opposition papers, attempts to direct the Court to the paragraphs within the Amended Complaint that contain such allegations but fails to specify the numbered paragraphs.[16] In any event, this Court can find no allegation of specialized damages in plaintiff's Amended Complaint and therefore her claim for prima facie tort must fail.

## CONCLUSION

For all of the foregoing reasons, the motion of plaintiff Saeeda A. Mahmud, M.D., to amend her Complaint is granted and the motion of defendants Walter Kaufmann, M.D., Jeff Auerbach, M.D., Jane Brooks, M.D., Gopal Shah, M.D., and David Brody M.D., to dismiss the Amended Complaint is granted in part and denied in part. It is granted with prejudice with respect to the third cause of action under NYHRL and regarding the eighth and tenth causes of action which are essentially claims for prima facie tort. However, it is denied with respect to first and second causes of action under the § 1981 claims, the fourth cause of action under NYHRL, the sixth and seventh causes of action for antitrust claims under the Sherman Act and the New York General Business

---

[16] Plaintiff merely states, "As far as 'special damages', we refer the Court to ¶s    of the Amended Complaint for allegations of special damages." (Pl. Mem. Opp. Mot. Dismiss at 5.)

Law, and the fifth and ninth causes of action for tortious interference with prospective economic advantage.

SO ORDERED.

Dated:  White Plains, New York
       September 27, 2006

 

                                  Sr. United States District Judge